# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOHN E. MANNERY, JR.,

          Plaintiff,

 v.                                         **Case No. 23-CV-1314**

ANTHONY MOYLE, *et al.*,

          Defendants.

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff John E. Mannery, Jr., who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Mannery was allowed to proceed on claims pursuant to the Eighth Amendment against Anthony Moyle, Domingo Camarena, Jennifer Feltz, and Dr. Phillip O. Wheatley for allegedly failing to appropriately address his foot and back pain. He was also allowed to proceed on a claim against defendant Michael Verheyen for allegedly placing him in unconstitutional conditions of confinement when Mannery was sent to Temporary Lock Up ("TLU"). The defendants filed a motion for summary judgment, which is ready for a decision. (Docket # 42.) The parties have consented to the jurisdiction of a magistrate judge. (Docket # 8, 14.) For the reasons stated below, the court grants the defendants' motion for summary judgment and dismisses the case.

*Parties*

At all relevant times, Mannery was housed at Oshkosh Correctional Institution. (Plaintiff's Proposed Findings of Fact ("PPFOF"), Docket # 70, ¶ 1.) Dr. Wheatley was employed as a physician at Oshkosh; Moyle was a Nurse Clinician 2; Feltz was a Nurse Clinician 2; Camarena was a Correctional Sergeant; and Verheyen was a Supervising Officer 1 ("Lieutenant"). (Defs.' Amended Proposed Findings of Fact ("DPFOF"), Docket # 63, ¶¶ 2–5.)

*Initial Injury*

On December 8, 2022, Mannery injured his toenail playing basketball; specifically, his "toenail was creased laterally with a small amount of blood under the nail and the nail was detached at the front of the toe." (DPFOF ¶ 14.) Moyle examined Mannery and cleaned the wound and wrapped his foot in an ACE bandage. (PPFOF ¶ 8.) Mannery asserts that his "foot was in extreme pain and throbbing like a heartbeat. Mannery could not balance, put pressure on his foot, or walk on it at all." (*Id.*, ¶ 5.) Moyle observed that the only visible injury was Mannery's toenail, but he acknowledged that Mannery reported he could not "bear his full weight on his foot due to the pain caused at his toenail." (DPFOF ¶ 15.) Moyle gave Mannery crutches, Tylenol, and an ice bag to address the pain. (*Id.*) He also ordered a "tray assist, which is a service offered for any person who may have difficulty holding on to a food tray due to physical or mobility limitations." (*Id.*)

At the time, Moyle did not feel a wheelchair was appropriate because pain from a bent-back toenail should start to recede within a few days. (DPFOF ¶ 16.) Moyle provided Mannery crutches as a comfort measure because, to his knowledge, Mannery's only injury

was his toenail, and in his professional opinion, Mannery should have been able to walk on his foot relatively soon. (*Id.*, ¶ 19.) Moyle asserts that Mannery told him he knew how to use crutches. (*Id.*, ¶ 17.) Mannery states that he never told Moyle he knew how to use crutches. (PPFOF ¶ 11.)

Mannery also states that he told Moyle he was housed on the upper tier of his housing unit, and Moyle told him he would put in an order for Mannery to be moved to a lower tier. (*Id.* ¶ 12.) Moyle states he told Mannery he would request a low-tier restriction, but Mannery told him he did not want to move to a different cell. (DPFOF ¶ 18.) Mannery denies ever telling Moyle he did not want to move to a low-tier cell. (PPFOF ¶ 14.) It is undisputed that Moyle did not have Mannery fill out a DOC-3220 Refusal for Recommended Health Care regarding Mannery's refusal to move to a low-tier cell. (DPFOF ¶ 22.)

Later that day, when Mannery returned to his housing unit using the crutches, Camarena called Mannery to the Officer's station to ask why. (DPFOF ¶¶ 26–27.) According to Camarena, Mannery told him he hurt his ankle, and when Camarena asked why Mannery did not have a low-tier restriction, Mannery told him that he did not want to move cells because he was happy with his cellmate. (*Id.*, ¶ 28.) Mannery states that he told Camarena he hurt his foot playing basketball and was "in extreme pain." (PPFOF ¶ 20.) He also asserts that Camarena did not ask about a low-tier restriction, but instead Mannery informed him that Moyle was putting in an order for a low-tier restriction. (*Id.*, ¶¶ 21–22.) Camarena states he called the Health Services Unit ("HSU") and spoke with Moyle, who confirmed that Mannery had a low-bunk restriction but not a low-tier restriction because Mannery declined the low-tier restriction. (DPFOF ¶ 29.) Mannery states that Camarena

3

looked up what restrictions Mannery had in the system and could not find a low-tier restriction for Mannery. (PPFOF ¶ 23.) At that point, Mannery asked Camarena to call Moyle, and when he did so, Moyle explained to Camarena that Mannery did not need a low-tier restriction due to the nature of his injury. (*Id.*, ¶ 26.) Mannery asked Camarena to move him to a lower tier anyway, and Camarena refused because Camarena did not have the authority to put one in place. (*Id.*, ¶ 30.) Mannery notes that Moyle's and Camarena's decision to not give Mannery a low-tier restriction violated Wisconsin Department of Corrections policy. (*Id.*, ¶ 28.)

Later that day, Mannery filled out a Health Service Request ("HSR") stating, "I hurt my foot playing basketball. . . . I am in a room on the upper tier. It's hard to use the crutches to go up and down on the stairs." (Docket # 68-2 at 12.) Non-defendant Michal Miner responded to the HSR that Mannery was "given lower tier 12/10/22." (*Id.*)

*The December 10 Fall*

On December 10, 2022, Mannery was called "to go on a pass," and moved to go down the stairs using his crutches. (PPFOF ¶ 42.) He fell from either the seventh or eighth stair to the bottom of the staircase. (*Id.*) Housing unit staff called a medical emergency and Feltz reported to the housing unit. (*Id.*, ¶ 47.) Mannery states he "was in excruciating pain all over his body and needed to be picked up off the floor and placed into a wheelchair." (*Id.*, ¶ 49.) He states he "injured his mid-to lower back (left side), leg, neck, ankle, and [suffers] daily severe migraine headaches" as a result of the fall. (*Id.*, ¶ 51.)

Feltz examined Mannery, noting he "had a full range of motion of his torso and left knee but had outward signs of pain (grimacing and wincing) and guarding during assessment. He had no bruising or other abnormalities to his left side." (DPFOF ¶ 37.)

4

Mannery "rated his pain at an 8/10". (*Id.*) Feltz, using "the musculoskeletal nursing protocol," gave Mannery ibuprofen, an ice bag, and lidocaine cream to manage his pain. (*Id.*, ¶ 38.) She also entered an order for a low-tier restriction and continued Mannery's order for crutches and a tray assist. (*Id.*) Mannery was scheduled to see Dr. Wheatley for a follow-up the next Monday. (*Id.*) Mannery states that Feltz was frustrated that he did not already have a lower-tier restriction, but Feltz says she does not recall commenting on that. (*Id.*, ¶ 40; PPFOF ¶ 47.) Feltz also made a note on the medical records that she would order a wheelchair for Mannery to use for longer distances, but the order was never entered into the system. (DPFOF ¶ 41.)

*Mannery's Medical Treatment After His Fall*

On December 12, 2022, Dr. Wheatley examined Mannery. (DPFOF ¶ 43.) Mannery reported pain in his neck, left foot, and lower back that radiated to his left leg. (*Id.*) Mannery reported that the ibuprofen was "not very helpful." (*Id.*) Dr. Wheatley noted Mannery "was able to slowly stand from the wheelchair . . . [and had] increased muscle tone and tenderness along his lumbar region and lower half of his neck, especially on the left side." (*Id.*, ¶ 44.) Mannery's left foot was not swollen, but there was "tenderness at the first toe and ball of the foot." (*Id.*) In addition to continuing the ibuprofen, Dr. Wheatley added Tylenol and cyclobenzaprine (a muscle relaxant) for pain relief. (*Id.*, ¶ 45.) Dr. Wheatley also ordered x-rays of Mannery's back and left foot. (*Id.*) A CT scan was also ordered "to check for a potential herniated disc[.]" (*Id.*) Dr. Wheatley ordered a long-term low-bunk/low-tier restriction, abdominal binder to support Mannery's back, and a wheelchair for distance. (*Id.*) Dr. Wheatley's prescription for cyclobenzaprine was limited to seven days "because

DOC providers are limited to prescribing 21-days of cyclobenzaprine per 3-month period." (*Id.*, ¶ 46.)

On December 14, 2022, Mannery's left foot and lumbar spine were x-rayed, and the x-rays were both normal. (*Id.*, ¶ 49.) That same day, Moyle examined Mannery for continued pain, and he recommended Mannery continue to use his prescribed medicines while also promising to speak with Dr. Wheatley about increasing his pain medications. (*Id.*, ¶ 50.) On December 15, 2022, Dr. Wheatley conducted a follow-up examination of Mannery. (*Id.*, ¶ 51.) Mannery stated that his pain worsened when he attempted to bear weight on his left foot. (*Id.*) He also stated his back pain worsened with movement, sometimes causing spasms. (*Id.*) Dr. Wheatley noted that Mannery was spending most of his time in a wheelchair. (*Id.*, ¶ 52.) Mannery also told Dr. Wheatley that the ibuprofen, Tylenol, and cyclobenzaprine were only providing him with "partial relief." (*Id.*) Dr. Wheatley noted that Mannery was scheduled for a CT scan, and he recommended that Mannery continue with the prescribed pain regimen while awaiting the CT scan. (*Id.*, ¶ 53.) Dr. Wheatley states that he informed Mannery that his cyclobenzaprine prescription was due to run out in a few days and told Mannery to notify HSU if his pain increased after stopping cyclobenzaprine. (*Id.*, ¶ 54.) Dr. Wheatley also encouraged Mannery to attempt to slowly move and to improve his flexibility to begin to alleviate his pain. (*Id.*, ¶ 55.) He further recommended that Mannery try to gradually increase bearing weight on his foot to regain the ability to use his foot because the x-ray did not show a fracture. (*Id.*, ¶ 56.)

On December 19, 2022, Mannery's cyclobenzaprine prescription ended. (*Id.*, ¶ 58.) The next day HSU received an HSR from Mannery stating, "They stopped the muscle relaxers cyclobenzaprine 10mg. I need a refill of ibuprofen 800mg." (*Id.*, ¶ 59.) Mannery

6

also sent two additional HSRs noting that his pain increased. (PPFOF ¶¶ 69–71.) Mannery received a response that the HSRs were referred to Dr. Wheatley. (*Id.*, ¶¶ 70–72.) Dr. Wheatly states he did not see or respond to the HSRs. (DPFOF ¶ 65.)

Also on December 20, 2022, Mannery was examined by non-defendant Nurse Holland for pain, and according to Holland, he "became agitated and argumentative, refusing any assessment or interventions. He stated that he had gone through all his provided ibuprofen and acetaminophen, and he was out of muscle relaxers. He argued that he could not use the crutches and stated that he needed a 'new plan of care' noting that he had 'no fucking plan of care in place.'" (*Id.*, ¶ 62.) Holland reviewed Mannery's current plan of care and informed him he had an upcoming appointment with Dr. Wheatley. (*Id.*) Nursing staff also went over Mannery's plan of care on December 21, 22, and 26, 2022. (*Id.*, ¶ 67.)

On December 27, 2022, Mannery was examined by non-defendant nurse Maggie Tischauser, who then spoke to Dr. Wheatley about providing Mannery five additional days of cyclobenzaprine. (*Id.*, ¶ 68.) Dr. Wheatley agreed to provide additional cyclobenzaprine. (*Id.*) Tischauser also provided Mannery with a muscle rub and a plastic bag for a hot pack. (*Id.*) She educated him on stretches he could do to alleviate pain and confirmed that his ibuprofen was refilled. (*Id.*) At the time, Mannery had reached his monthly limit for acetaminophen, so she could not refill that prescription. (*Id.*)

Dr. Wheatley examined Mannery again on December 29, 2022, and Mannery reported that his foot pain was gradually improving but his back pain was still an issue. (*Id.*, ¶ 70.) However, Dr. Wheatley noted there were no "significant changes" to Mannery's condition. (*Id.*) Dr. Wheatley encouraged Mannery to gradually increase his movement and

7

activity level, and he considered possibly prescribing physical therapy. (*Id.*, ¶ 71.) He also placed a request for Mannery to receive more than his maximum allowed dose of acetaminophen for three months. (*Id.*, ¶ 72.)

On January 3, 2023, Mannery was examined by non-defendant Nurse Brickner, and Mannery complained of wrist pain from using his crutches. (*Id.*, ¶ 73.) Brickner instructed Mannery to start putting his body weight on his legs instead of his shoulders and wrists while using the crutches. (*Id.*) He was also instructed to use the wrist splints he received in January 2022. (*Id.*) On January 4, 2023, Mannery submitted another HSR complaining of wrist pain from the crutches, and soreness in his leg and foot. (PPFOF ¶ 78.)

On January 6, 2023, Tischauser noted that Mannery was not using his crutches and was only using a wheelchair in the housing unit. (DPFOF ¶ 75.) Mannery stated he could not use his crutches because of his wrist pain. (Pl.'s Resp. to DPFOF ("Pl.'s Resp."), Docket # 69, ¶ 75.) On January 9, 2023, Holland examined Mannery, noting that his lower back pain had increased. (*Id.*, ¶ 76.) Holland states that Mannery could self-propel his wheelchair and could use both arms without signs of distress. (*Id.*) Mannery disputes this, noting he always had a wheelchair pusher. (*Id.*) Holland discussed her exam with Dr. Wheatley, who approved a walker for Mannery to use while on unit. (*Id.*, ¶ 77.)

On January 10, 2023, Dr. Wheatley examined Mannery, who stated his left foot pain was improving. (DPFOF ¶ 79.) Mannery reported that his headaches continued and his back pain persisted. (*Id.*) He also told Dr. Wheatley that he could not use his walker because it hurt his wrists. (*Id.*) Mannery requested that he be able to use a wheelchair on the housing unit in order to go to the bathroom or pick up ice. (*Id.*) Dr. Wheatley agreed that Mannery could use his wheelchair in his housing unit (*Id.*, ¶ 83.) Dr. Wheatley also ordered another

8

x-ray of Mannery's left foot and encouraged Mannery to increase his physical activity and scheduled him for physical therapy. (*Id.*, ¶¶ 80, 82.)

On January 11, 2023, Mannery had a follow-up x-ray on his foot, and the results were normal. (Pl.'s Resp. ¶ 94.) On January 27, 2023, non-defendant Officer Coates reported that he observed Mannery independently dress, bathe, use the bathroom, and complete a hygiene routine as well as obtain a food tray without assistance. (DPFOF ¶ 95.) Mannery questions how Coates could have made these observations because he was not a regular officer on his housing unit. (Pl.'s Resp. ¶ 95.) He also disputes that he was able to do these activities independently. (*Id.*) On February 7, 2023, Dr. Wheatley examined Mannery, who reported that his back pain had not improved, especially when standing. (DPFOF ¶ 97.) However, Dr. Wheatley did not observe any indication that Mannery's symptoms were worsening. (*Id.*, ¶ 98.) Because Dr. Wheatley was waiting for Mannery to have a CT scan, there was not much more Dr. Wheatley could do other than encourage Mannery to move more. (*Id.*, ¶ 99.) He also told Mannery that he should be able to start physical therapy soon. (*Id.*, ¶ 100.)

Mannery's orders for a walker and a wheelchair for distances expired on February 8, 2023, and February 10, 2023, respectively. (Pl.'s Resp. ¶¶ 101–102.) On February 22, 2023, Mannery submitted an HSR requesting that his lower bunk restriction, wheelchair for distances, back brace, tray assist, and walker be reinstated. (*Id.*, ¶ 103.) Over the next few days, Mannery's orders and restrictions were reinstated. (*Id.*, ¶¶ 104–105.)

On March 30, 2023, Dr. Wheatley examined Mannery, who reported his symptoms had not changed. (*Id.*, ¶ 107.) Because they were still waiting for a CT scan, Dr. Wheatley again encouraged Mannery to start to move more. (*Id.*) On April 10, 2023, Mannery had a

9

CT scan of his lumbar spine, "which found intervertebral disc bulging and ligamentum flavum hypertrophy at the L3-4 and L4-5 levels resulting in central stenosis and neural foraminal narrowing." (*Id.*, ¶ 108.) There was no evidence of compression or fractures. (*Id.*) Dr. Wheatley reviewed these results with Mannery on April 24, 2023. (*Id.*, ¶ 111.)

On May 1, 2023, Dr. Wheatley examined Mannery, who reported the same symptoms. (*Id.*, ¶ 112.) Dr. Wheatley determined that Mannery's symptoms were not worsening and informed Mannery that his lingering pain may be due to the muscles around his spine weakening. (*Id.*) Dr. Wheatley noted that Mannery was scheduled to go to an offsite pain clinic for treatment. (*Id.*, ¶ 113.) Dr. Wheatley also started Mannery on duloxetine for pain. (*Id.*) Dr. Wheatley examined Mannery often for the next several months, adjusting his pain medications based on Mannery's reports. (*Id.*, ¶¶ 114–121.) Treatment during this period included starting Mannery on prednisone and having Mannery's pelvis x-rayed. (*Id.*) Eventually, Mannery went to an offsite pain clinic and was scheduled for a lumbar epidural steroid injection, which Mannery received. (*Id.*, ¶ 122; PPFOF ¶ 99.) Dr. Wheatly was no longer Mannery's advanced care provider after September 5, 2023. (Pl.'s Resp. ¶ 124.)

*Mannery's Time in TLU*

On January 10, 2023, a nurse noticed Dr. Wheatley's order for use of a wheelchair on unit and raised concerns to Feltz. (*Id.*, ¶ 85.) Particularly, the nurse indicated that several housing officers had called the HSU multiple times over the past week complaining that Mannery was using the wheelchair almost exclusively and would not let other inmates in the housing unit use it. (*Id.*) Mannery disputes this. (*Id.*) The officers also reported that Mannery was able to walk in his cell without a walker and could use a walker to get to the

bathroom. (*Id.*) As a result, Feltz discussed the order with Dr. Wheatley, and Dr. Wheatley reconsidered his order to allow Mannery to use the wheelchair on unit. (*Id.*, ¶ 87.) Mannery states that Dr. Wheatley made the decision to rescind the order because Feltz told him allowing usage of a wheelchair on unit was rarely permitted. (*Id.*)

Around 8:15 p.m. on the evening of January 10, 2023, Mannery was using the wheelchair on the housing unit and the housing officers directed him to stop using the chair. (PPFOF ¶¶ 81–83.) Mannery informed the officers that Dr. Wheatley had authorized the use of the wheelchair on unit. (*Id.*, ¶ 84.) The officers checked the system and saw there was not an order for short-distance use of a wheelchair. (*Id.*, ¶ 86.) The officers then called HSU and confirmed that Mannery could not use the wheelchair. (*Id.*, ¶ 87.) Mannery also states that Feltz told the officers that Mannery was faking his injury and manipulating Dr. Wheatley into letting him use the wheelchair. (*Id.*, ¶ 88.) As a result, Mannery received a conduct report for misusing the wheelchair. (*Id.*, ¶ 89.)

Verheyen then came to escort Mannery to TLU. (*Id.*, ¶ 90.) Mannery explained to Verheyen that he injured his foot and that he had fallen down the stairs. (*Id.*, ¶ 91.) He described his injuries and lingering pain to Verheyen, stating he could not get around TLU without a mobility device. (*Id.*, ¶ 92.) Mannery asserts that Verheyen then called HSU, and Feltz told Verheyen that Mannery was faking his injuries. (*Id.*, ¶ 93.) Verheyen disputes this, stating that the female nurse he spoke to told him that Mannery could walk short distances using a walker and could move around TLU without assistance. (DPFOF ¶ 138.)

Once Mannery was brought to his cell in TLU, it is undisputed that Verheyen pulled the mattress from the back of the cell to the front of the cell near the door. (PPFOF ¶ 94.) Verheyen states he did so because Mannery told him he could not walk to the back of the

11

cell, and because inmates often move their mattresses near the door while in TLU so they can talk to other prisoners through the door cracks. (DPFOF ¶¶ 140–141.) Mannery asserts that he never told Verheyen he could not walk to the back of the cell and that it was Verheyen's decision to put the mattress on the floor. (PPFOF ¶¶ 94–95.) Mannery was then placed on his mattress, and he states that he remained there for nine days because he could not move. (*Id.*, ¶ 96.) As a result, he could not sleep, brush his teeth, or shower. (*Id.*) It is undisputed that Verheyen did not work in the TLU from January 11, 2023, through January 19, 2023. (Pl.'s Resp. ¶ 143.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial.

12

*See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Mannery claims that Moyle and Camarena violated his constitutional rights when they failed to place him on a low-tier restriction. He also claims that Feltz violated his constitutional rights when she denied him use of a wheelchair and told officers that he was faking his injury. He further claims Dr. Wheatley violated his constitutional rights when he failed to appropriately treat his pain resulting from his fall. Finally, he claims that Verheyen placed him in unconstitutional conditions of confinement when he placed his mattress on the floor in TLU. I will address each argument in turn.

### 1. Claims Against Moyle and Camarena

A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v.*

13

*Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The parties do not dispute that Mannery's injuries and pain were objectively serious.

To demonstrate that an official was deliberately indifferent, a plaintiff must show "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id.* The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

Taking the facts in a light most favorable to Mannery, Moyle's decision to not place him on a low-tier restriction does not amount to deliberate indifference. At the time Moyle examined Mannery, Mannery was suffering from a bent-back toenail. In Moyle's professional opinion, the pain associated with such an injury should have subsided relatively quickly, and the crutches he provided Mannery were not entirely necessary but instead added comfort. In the same vein, Moyle, in his professional judgment, did not believe a low-tier restriction was necessary given the nature of the injury. The Seventh Circuit Court of Appeals has "emphasized the deference owed to the professional judgment of medical personnel." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* Only where the medical professional's choices "depart[] radically from 'accepted professional practice'" does a plaintiff demonstrate deliberate indifference." *Id.*

14

(quoting *Pyles*, 771 F.3d at 409.) Mannery does not demonstrate that Moyle's opinions were a radical departure from accepted professional practice. Summary judgment is granted in Moyle's favor.

Also, Mannery has not produced sufficient evidence to permit a reasonable fact finder to find that Camarena was deliberately indifferent when he refused to place Mannery on a low-tier restriction. Non-medical professionals, like security officers, are "entitled to rely on the medical professionals' determination[s]" concerning a prisoner's health care and recommended treatment. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). In the Eighth Amendment context, "the only exception to this rule is that nonmedical officers may be found deliberately indifferent if they have reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotations omitted). Given the nature of Mannery's injury and Moyle's recommendation, no reasonable fact finder could conclude that Camarena had reason to believe that Moyle's recommendations were inappropriate. Summary judgment is granted in Camarena's favor.

   2.  *Claim Against Dr. Wheatley*

Mannery argues that Dr. Wheatley's delays in treating his pain amounts to deliberate indifference. "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must . . . provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties,* 836 F.3d at 730–31. In the case of unnecessarily prolonged pain, delaying treatment of a "readily treatable condition suffices" to demonstrate deliberate indifference. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). By Mannery's own assertions, his pain was not readably treatable. Dr. Wheatley tried

15

several different combinations of pain treatment, and Mannery kept reporting that they were ineffective. This is not a case of a medical professional "persisting in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730. Instead, Dr. Wheatley examined Mannery on a consistent basis over a several-month period, and the undisputed evidence shows that he tried a variety of treatments.

Mannery also highlights the discontinuation of his cyclobenzaprine prescription as evidence of Dr. Wheatley's deliberate indifference, but, again, by Mannery's own assertions, the lack of cyclobenzaprine did not worsen his condition. Mannery told Dr. Wheatley the cyclobenzaprine was providing him only with "partial relief". (DPFOF ¶ 52.) Dr. Wheatley construed this as Mannery stating it was not effective, and reasonably, then, given the controlled nature of the drug, discontinued the prescription. When Mannery complained that it was discontinued, Dr. Wheatley reinstated the prescription. No reasonable fact finder could conclude that this was evidence of deliberate indifference.

Similarly, no reasonable fact finder could conclude that Dr. Wheatley's decision to rescind his permission to allow Mannery to use a wheelchair in the housing unit was deliberate indifference. Dr. Wheatley's decision does not rise to the level of a "significant departure from accepted professional standards or practices." *Pyles*, 771 F.3d at 409. Even when taking the facts in a light most favorable to Mannery, where Mannery asserts that Dr. Wheatley's decision was based off of housing unit rules, that is not an unreasonable decision. (Pl.'s Resp. ¶ 87.) Prison medical officials often have to consider safety and security concerns when making treatment decisions.

Mannery suffers from chronic pain that was exacerbated by his December 10 fall. The undisputed facts demonstrate that Dr. Wheatley reasonably pursued several paths to

16

attempt to alleviate Mannery's pain. The Eighth Amendment does not "impose the unrealistic requirement that doctors keep their patients completely pain-free." *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023). Without showing that Dr. Wheatley's approach to Mannery's pain was so far afield of professional standards, Mannery cannot demonstrate deliberate indifference. Summary judgment is granted in Dr. Wheatley's favor.

### 3. Claim Against Feltz

Mannery's deliberate indifference claim against Feltz is limited to her decision to intervene with Dr. Wheatley's decision to allow Mannery to use a wheelchair in the housing unit.[1] Mannery asserts that Feltz's actions were limited by her belief that Mannery was faking his injuries. Even if true, as discussed above, because it is undisputed that Dr. Wheatley's ultimate decision was based off of housing unit rules, it does not amount to deliberate indifference. Consequently, Feltz cannot be held liable for deliberate indifference for denying Mannery the use of the wheelchair. Summary judgment is granted in Feltz's favor.

### 4. Conditions of Confinement Claim Against Verheyen

Mannery argues that Verheyen, by putting his mattress on the floor near the door in TLU, caused unconstitutional conditions of confinement. "The Eighth Amendment can be violated by conditions of confinement in a jail or prison when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of the minimal civilized measure of life's necessities' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

---

[1] As limited by the screening order. *See Werner v. Hamblin*, Case No. 12-C-0096, 2013 WL 788076 at *2 (E.D. Wis. March 1, 2013).

Mannery states that as a result of being placed on a mattress, he was unable to move for nine days, causing him to be unable to brush his teeth, shower, or sleep. However, Mannery provides no evidence that he ever told Verheyen (or any other officer) that he could no longer move once he was placed on the mattress. Accordingly, he does not establish that Verheyen was aware of the conditions he was in. Coupled with the undisputed fact that Verheyen did not work in TLU during that nine-day period, no reasonable fact finder could conclude that Verheyen was aware of these conditions. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Summary judgment is granted in Verheyen's favor.

## CONCLUSION

The defendants' motion for summary judgment is granted. The defendants also argued that they are entitled to qualified immunity, but because the Court found in their favor on the merits, it does not need to address the qualified immunity argument. Additionally, at screening, the Court accepted supplemental jurisdiction over Mannery's state law claims. Now that the court has granted summary judgment in favor of defendants and dismissed the federal claims, the court declines to continue to exercise that jurisdiction. *See* 28 U.S.C. § 1367(c); *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 42) is **GRANTED**.

18

**IT IS FURTHER ORDERED** that Mannery's motion for sanctions (Docket # 72) and the Defendants' motion to enlarge time to file a reply in support of their motion for summary judgment (Docket # 73) are **DENIED as moot**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED.** The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 3rd day of June, 2026.


BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

20

Case 2:23-cv-01314-NJ    Filed 06/03/26    Page 20 of 20    Document 77